MEMORANDUM OF DECISION
On October 30, 1998, the petitioner, Kristine D. Ragaglia, Esq., Commissioner of the Department of Children and Families ("DCF"), filed a petition to terminate the parental rights of Paula S. and Noel O. to their daughter, Jhoselyn O. Trial concerning the petition took place on October 4, 1999. At trial, the court entered a default as to Noel O. For the reasons stated below, the court grants the petition to terminate parental rights.
FACTS
The court finds the following facts and credits the following evidence.
A. Background of the Case
Jhoselyn, who is about to turn eight years of age, is the daughter of Paula S. (now age twenty-five) and Noel O. Paula's childhood in Puerto Rico was marked by her witnessing of her sister being sexually abused and raped by her stepfather. At age 14, she fled her family after she herself was sexually assaulted. At age 16, she became pregnant with Jhoselyn, who was born in October, 1991. Shortly thereafter, in February, 1992, Jhoselyn's temporary custody was granted to her maternal grandmother. When Paula S. was seventeen, she was incarcerated for eighteen months CT Page 13739 for possession of drugs with intent to sell. Her family (with Jhoselyn) moved to Hartford in 1993. Paula S. was released in September, 1994 and joined her family in Connecticut in June, 1995. The father, Noel O., has had no contact with Jhoselyn since her birth. In June, 1996, Paula S. gave birth to a second child, Jose, who is not a subject of this proceeding.
On August 26, 1996, Hartford police made a report of neglect concerning Jhoselyn, as a result of her having suffered a gunshot wound to her left index finger while in Paula S.'s care. Paula S. provided various inconsistent versions as to how Jhoselyn came to be injured. This incident (hereinafter the "August, 1996 incident") resulted in an Order of Temporary Custody ("OTC"), dated August 28, 1996, wherein the Superior Court for Juvenile Matters (McLachlan, J.) found Jhoselyn and Jose to be in immediate physical danger from their surroundings. They were placed in DCF's temporary custody.[2]
The August, 1996 incident also resulted in an October, 1996 felony conviction for Paula S., for risk of injury to a minor, and a suspended sentence of four years incarceration, with four years probation.
After her bullet wound, Jhoselyn was treated at Connecticut Children's Medical Center. Her physician reported that her finger will never recover to its pre-injury status, because part of the finger is gone. Investigation by DCF revealed that the maternal grandmother, who had cared for Jhoselyn almost since birth, had a criminal case of her own pending at the time of the August, 1996 incident. Also, she had recently lost her home due to a fire. Subsequent to her incarceration as a result of the incident, Paula S. was unemployed and homeless. Jhoselyn was placed in foster care. In December, 1996, Jhoselyn disclosed that she had been sexually molested by her mother and her maternal grandmother. Investigation of these allegations proved inconclusive.
Subsequent to the OTC, Paula tested positive for marijuana usage. In February, 1997, DCF reported that Paula had not been complying with its recommendations, including individual and family therapy and random drug screens. However, she visited Jhoselyn on a regular basis.
Also in February, 1997, Paula entered a nolo contendere plea to DCF's neglect petition concerning Jhoselyn. A default was CT Page 13740 entered as to Noel O. Jhoselyn was then adjudicated neglected and her custody was committed to DCF, effective February 21, 1997. At that time, Paula S. signed and the court (Teller, J.) entered Expectations of Paula concerning Jhoselyn, including: visitation, participation in counseling (including relating to domestic violence), drug/alcohol assessment and following recommendations thereof no substance abuse, no further involvement with the criminal justice system, and compliance with conditions of probation.
On February 17, 1998, the court (Keller, J.) extended the commitment until February 21, 1999. The court found that continued efforts toward reunification were no longer appropriate (without prejudice to the father) and found that preventive and reunification efforts to make it possible for the child to return home were made by the state. Further publication service was ordered and occurred as to Noel O. On October 1, 1998, the court again found that reunification efforts as to both parents were not appropriate. In February, 1999, the court (Dyer, J.) extended the commitment until February 21, 2000; confirmed that service by publication of the petition for termination of parental rights on Noel O. had occurred, securing jurisdiction over him; and recommended that he be defaulted at the trial on the petition.
B. Jhoselyn and Her Progress in Foster Care
Due to the maternal grandmother's criminal history, the allegations of sexual abuse and her failure to consistently visit the child, DCF rightly refused to consider her as a resource for Jhoselyn.[3] Jhoselyn's finger has healed well. At the time of the filing of the petition, she was doing well academically in elementary school. She has been diagnosed as having Reactive Attachment Disorder, and takes Ritalin to control her behavior.
Due at least in part to her difficult behavior, she has been placed in several different foster homes by DCF. In 1997, she spent one month at The Institute of Living. She has been at her present placement, a therapeutic foster home, since June, 1998. She lives with her foster mother, Maria, Maria's three teenage children, and another foster child. She has developed a close bond with her foster mother and continues to do well in school. She continues to receive individual counseling and psychiatric treatment; initially services were provided at the Institute For The Hispanic Family and more recently at The Village for Families and Children, Inc. CT Page 13741
A court-ordered psychological evaluation of Paula S. and Jhoselyn by Dr. Grenier occurred in June, 1998. At that time, the psychologist recommended that Jhoselyn be returned to her mother's care when feasible. She also recommended that, if Paula S. continued with treatment for the next three months, and remained drug-free, return of the child to her, under DCF supervision "can be considered." Pet. Exhibit No. 8, par. 11. Unfortunately, on August 5, 1998, Paula S. was once again arrested. This resulted in misdemeanor convictions for criminal trespass and possession of marijuana, revocation of her previous probation, and a sentence of eighteen months incarceration
Jhoselyn has proved to be a child with specialized needs. She has exhibited sexually inappropriate behavior and homicidal gestures. It seems clear that the child was exposed to sexual abuse and witnessed violence in her home prior to her removal.
Her behavioral problems have included stealing from and lying to her foster family. Acting out at school included fighting and stealing. Apparently these behavioral problems were addressed in therapy; her feelings concerning her mother appeared to be a cause of these difficulties.
As of December, 1998, her psychotherapist at The Village for Families and Children concluded that she had a high level of anxiety and that her "stealing, lying and manipulative behavior are survival mechanisms observed in children suffering from attachment disorders. Permanency plans should be an area to focus on before more damage . . . is done to Jhoselyn's emotional life." Pet. Exh. No. 11, at 4: Besides Reactive Attachment Disorder of Early Childhood-Disinhibited Type, her clinician included in her diagnosis that Jhoselyn suffered from post traumatic stress disorder. Id.
Upon re-evaluation by Dr. Grenier in April, 1999, Jhoselyn was apparently somewhat improved and more stable. Continued psychotherapy was recommended in order to address previously identified issues. Dr. Grenier noted that it was no longer in Jhoselyn's best interests to continue to attempt reunification with her mother at this time. Dr. Grenier concluded by stating that the instability of Jhoselyn's status was affecting her and, since there was no guarantee that her mother could show "significant stability" for at least another year, "[f]or Jhoselyn, this time period is too long, and is likely to lead to CT Page 13742 further emotional/behavioral difficulties, particularly if her mother is unable to remain drug free and the child is once again disappointed." Pet. Exh. 9, at 5. Jhoselyn has refused to discuss her mother in therapy. She has expressed a desire to remain in her foster home.
By June of 1999, Jhoselyn's behavior had again improved. At the end of July, 1999, Jhoselyn's psychotherapist observed that her mother had been "extremely inconsistent with her efforts to be reunited with her daughter." She noted that Jhoselyn's behavior improved when she had no contact with her mother. At trial, where her foster mother was present in court, it was represented that her foster mother is now seriously considering adopting Jhoselyn. Of note also is that, although Paula S. was brought from a correctional facility to court to attend the trial, she chose not to do so and had her attorney waive her presence.
C. The Mother
In addition to the history noted above concerning Paula S.'s criminal convictions and incarceration, she failed to keep several appointments at the Institute for the Hispanic Family for substance abuse evaluations, to which she had been referred by DCF in order to facilitate compliance with the court-ordered Expectations.
By her own admission, except for visiting her daughter, Paula S. did not comply with the Expectations. She failed to comply with the several treatment plans provided by DCF. She was referred also to the reunification program at Catholic Family Services in early 1997, but was ineligible due to positive drug screens. She failed to attend individual and family therapy sessions. She consistently failed to attend parenting classes. For example, Petitioner's Exh. 14, a letter from the Institute for the Hispanic Family, states that Paula S. began participating in their Parenting Skills Group in April, 1998, but only attended three sessions. As a result of three absences, she was discharged from the program in June, 1998.
After being incarcerated since August, 1998, Paula S. was released in March, 1999 to a halfway house, Hartford House. She agreed to a program plan, including drug/alcohol treatment. Pet. Exh. 13(b). Due to a violation of program provisions, she was again incarcerated on August 31, 1999. This violation stemmed CT Page 13743 from an incident at a restaurant in Hartford involving an altercation with an employee. Between March and August, 1999 she had begun to establish a good work record and had built up some savings. In addition, her drug screenings during that period were negative. She also consistently attended in-house Narcotics Anonymous meetings while at Hartford House. Unfortunately, she accumulated a number of rule violations during her stay at the program. Her projected discharge date from incarceration is January 17, 2000. See Pet. Exh. 13(a).
While expressing love and affection for her daughter, Paula S. has been unable to establish a stable life for herself. During the period since the OTC was issued in October, 1996, Paula S.'s contact with Jhoselyn has been inconsistent. Unquestionably, it was negatively effected by her lengthy incarceration after August, 1998. While incarcerated from between August, 1998 and March, 1999, she agreed to discontinue visits to prevent her daughter from being exposed to a prison environment. A visit was held in February, 1999, but Jhoselyn's behavior worsened thereafter, as she resumed stealing. Visits were then terminated based on this negative impact.In July, 1999, after Jhoselyn's behavior improved, and her mother was in the halfway house, Paula S. failed to appear for an appointment with the child's psychotherapist. Several attempts were made with Paula S. to schedule visits with Jhoselyn, but Paula S. either failed to appear or canceled on the day of the visits. One visit occurred on August 16, 1999; Jhoselyn was willing to see her mother but sought her foster mother for comfort and assistance. As noted above, she was re-incarcerated shortly thereafter.
D. The Father
The court's file reflects affidavits submitted by DCF concerning its efforts to locate the father, Noel O. Despite reasonable efforts by the Department, Noel O. could not be found. Service upon him in Puerto Rico was ordered by publication. The file reflects that publication concerning the neglect and termination petitions occurred in various newspapers there. He has not contacted the Department concerning Jhoselyn. He has never been involved in her upbringing and has not acted in any way as a parent.
ADJUDICATION
A. Reunification
CT Page 13744
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112 (c)(1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. On February 17, 1998 and on October 1, 1998 the court made the requisite finding that further efforts to reunify the parents with Jhoselyn are not appropriate. This court also finds, based on the evidence presented at trial, by clear and convincing evidence, that such efforts are not appropriate.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112 (c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book 33-3(a). The relevant date in this case is thus October 30, 1998.
DCF has alleged the grounds of failure to rehabilitate as to Paula S., and abandonment and lack of an ongoing parent-child relationship as to Noel O. The court finds that DCF has proven failure to rehabilitate against the mother and abandonment and lack of an ongoing parent-child relationship against the father by clear and convincing evidence.
1. Abandonment
General Statutes 17a-112 (c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re Migdalia M.,
CT Page 137456 Conn. App. 194, 208-209, cert. denied, 199 Conn. 809 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id. at 210.
Here, Noel O. abandoned Jhoselyn when she was born and ever since. He has had no relationship with her. He has left all responsibility for her well-being to others. Accordingly, DCF has proven abandonment by him.
2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). The court previously has found the child to have been "neglected," thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In reLuis C., 210 Conn. 157, 167 (1989). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is appropriate for the court to consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it.
Here, almost one year has elapsed since the October, 1998 termination petition, which is a reasonable time, especially given the age of the child.
After the tragic incident in August, 1996 when Jhoselyn CT Page 13746 received the gunshot wound, her mother, Paula S., was afforded opportunities for rehabilitation while she was on probation. She did not avail herself of the services offered to her concerning parenting, counseling, or substance abuse evaluation in any consistent manner. She repeatedly failed to follow through on recommendations which were made to her. She did make efforts to visit Jhoselyn, but those were disrupted by reincarceration in August, 1998 based on her drug-related conviction. While she initially had some success at the halfway-house in 1999, she was again incarcerated in August, 1999. Thus, since the August, 1996 incident, she has been incarcerated three separate times.[4]
During this period, others have had to meet Jhoselyn's specialized needs. She continues to receive therapy and medication for her condition.
As the Appellate Court recently noted in In re Danuael D.,51 Conn. App. 829, 839 (1999), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." At this point, it is evident that Paula S. has a long way to go to be in a position to be a proper parent for any young child, let alone one with Jhoselyn's needs. Upon release, she will have to address many issues in order to have a stable enough existence just to keep out of prison. Her track record over the past three years is not a good one. While her efforts initially at the halfway house offer some hope for her future, she has failed to rehabilitate herself to the point that "within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B).
3. No Ongoing Relationship
DCF also alleges that there is no ongoing parent-child relationship between Jhoselyn and Noel O. To prove this ground, DCF must show the absence of "the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(3) (D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former CT Page 13747 existence it has now been completely displaced." In re JuvenileAppeal (Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted). The decisive question is "whether the child has no present memories or feelings for the natural parent." Id. at 646.
Jhoselyn has never known Noel O. as her father, if at all. No relationship has ever developed between them. Accordingly, DCF has proven this termination ground as to him.
DISPOSITION OF THE TERMINATION PETITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interest of Jhoselyn clearly and convincingly favors termination of the parental rights of both her parents. Jhoselyn is bonded to her foster mother, who is meeting her specialized emotional needs, in a stable setting. Both her therapist at The Village for Families and Children, Inc., and Dr. Grenier see the continuation of a parental relationship with Paula S. as harmful to Jhoselyn. The court credits these views. She continues to suffer from emotional difficulty, including Reactive Attachment Disorder of Early Childhood — Disinhibited Type, and post-traumatic stress disorder. Her behavior has deteriorated recently at a time related to contact with her mother.
Instead of rising to the challenge presented by Jhoselyn's needs, Paula S. consistently has failed to do so. Her refusal to attend the trial provided a poignant coda to this sad history. As to Noel O., since he has never had any relationship with, nor taken any responsibility for Jhoselyn, it is evident that it is in her best interests to terminate his rights.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112 (e). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent. CT Page 13748
Based on the foregoing discussion, the court finds that DCF provided foster care for Jhoselyn and offered Paula S. services and visitation. These services were relevant to the needs of the mother. Since Noel O. could not be located, it was impossible to offer services and visitation to him.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF provided visitation, but that there was no reasonable possibility of reunification as a result of Paula S.'s incarcerations and failure to utilize services. Again, Noel O. could not be located, and made no effort to contact Jhoselyn or DCF, making reunification impossible.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On January 9, 1997, the court approved the following expectations for Paula S.: (1) keep all appointments set by or with DCF and keep whereabouts known to DCF and your attorney, (2) visit the child as often as DCF permits, (3) participate in counseling for parenting, individual needs, and substance abuse, and follow their recommendations, (4) no firearms in the home, (5) sign releases as requested; (6) secure and maintain adequate housing and income, (7) no substance abuse, (8) no further involvement with the criminal justice system, (9) comply with conditions of probation, and (10) cooperate with DCF investigations.
Based on the foregoing discussion, the court finds that Paula S. initially visited the child as required, but her subsequent incarcerations interfered with compliance. She did not fulfill her obligations to keep appointments, to participate in counseling, to secure and maintain adequate housing and income, and to have no further involvement with the criminal justice system. She was also found to have violated her probation. Again, no expectations were ordered as to Noel O. since he did not appear before the court. CT Page 13749
4) The feelings and emotional ties of the child with respect to her parents, any guardian of her person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, Jhoselyn is bonded to her foster mother. While willing to visit with Paula S., her behavior has deteriorated in direct relation to such contact. Her feelings and emotional ties to Paula S. have substantially lessened over time. She does not wish to discuss her mother in therapy. She has expressed her desire to remain with her foster family. She has no relationship with Noel O.
5) The age of the child
Jhoselyn is presently almost eight years old.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that Paula S. has not made reasonable efforts to rehabilitate herself. Since her incarceration in August, 1998, her contact with Jhoselyn has been sporadic. While she will again be released from incarceration in January, 2000, she will not then be in a position to properly care for Jhoselyn, a child with specialized needs. Noel O. has done nothing to establish or maintain contact with Jhoselyn.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent. The parents here did not face unreasonable interference from each other, from any third persons, or from economic circumstances. The parents' predicament is a consequence of their own actions and their own failure to act. CT Page 13750
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Jhoselyn O. for a termination of parental rights to enter with respect to the mother, Paula S. and the father, Noel O. Accordingly, the court hereby grants the petition to terminate the parental rights of Paula S. and Noel O. The court further orders that the Commissioner of DCF is appointed statutory parent for Jhoselyn for the purpose of securing an adoptive family. If the foster mother is willing to adopt, it is the court's direction that she receive first consideration. The Commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.[5]
It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT