## IN RE TABITHA P. ET AL.*
## (14028)

Schaller, Spear and Hennessy, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 4166B.2, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued May 23—decision released September 19, 1995

*Barbara J. Claire*, for the appellant (respondent).

*Benjamin Zivyon*, assistant attorney general, with whom were *Dennis Antonacci*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, for the appellee (petitioner).

*Richard A. Otto*, for the minor children.

HENNESSY, J. The respondent mother appeals from the judgment of the trial court terminating her parental rights with respect to her children, Tabitha and Damion. The respondent claims that the trial court improperly (1) relied on outdated reports by a clinical psychologist, (2) failed to credit the testimony of "joint" witnesses who testified on behalf of the respondent and stipulated testimony filed by the respondent, (3) concluded that there was no parent-child relationship even though this

ground for termination was not alleged by the petitioner, and (4) concluded that there was sufficient evidence of the respondent's failure to rehabilitate herself. We affirm the judgment of the trial court.

This matter came to the trial court by petitions of the department of children and youth services (DCYS)[1] filed on October 24, 1992,[2] requesting the termination of the respondent's parental rights with respect to her children Tabitha and Damion. At the time the petition was filed, Tabitha was eight years old and Damion was six years old. Each of the petitions recites the same allegations in connection with the respective child. The petitions allege that the children are committed to the custody of DCYS, having been found in a prior proceeding to be neglected or uncared for, and that the respondent has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of the children, she could assume a responsible position in their lives[3] and that this reason for termination has existed for not less than one year. See General Statutes § 17a-112 (b) (2). A trial was held on these petitions commencing on January 14, 1994, and concluding on March 7, 1994.

---

[1] In 1993, the department of children and youth services was renamed the department of children and families. We will refer to the agency as DCYS as that was the appellation of the agency during most of the events underlying this appeal.

[2] The petitions are date stamped October 16, 1992, by the trial court clerk. The trial court found, however, that the date of filing of the petitions was October 24, 1992. We note that any discrepancy is immaterial to the rights of the parties and is irrelevant to our disposition of this appeal.

[3] The petitions also alleged that the children had been denied by reasons of the respondent's act or acts of commission or omission, the care, guidance or control necessary for their physical, educational, moral or emotional well-being. See General Statutes § 17a-112 (b) (3). This ground for termination, however, was not pursued at trial and these allegations were therefore dismissed by the trial court. Accordingly, these allegations are not relevant to this appeal.

In a written memorandum of decision, the trial court found the following facts. The respondent has four children. The respondent voluntarily terminated her parental rights as to her first two children, born in 1980 and 1982, with the termination as to her second child occurring one month after Tabitha's birth in 1984. There has been almost continuous DCYS involvement in the respondent's relationship with Tabitha since her birth, and in the respondent's relationship with Damion since his birth in 1986.

Despite the assistance of DCYS and an equivalent agency in Pennsylvania,[4] the respondent has had great difficulty in parenting Tabitha and Damion. The children have been removed from the custody of the respondent on several occasions either through voluntary placement or through court order. During much of the time that the children were in the respondent's care, DCYS provided protective supervision.

The first petitions alleging that Tabitha and Damion were neglected and uncared for were filed in March, 1987. That occurred after Damion, who was less than one year old, had been referred to DCYS for a broken leg of unknown origin. At that time, the respondent, who was temporarily homeless, consented to the placement of both children with their maternal aunt. In May, 1987, upon the respondent's admission to allegations of neglect, Tabitha and Damion were adjudicated neglected and uncared for and guardianship was transferred to their maternal aunt. The respondent visited the children sporadically at first, and then, with some consistency starting in February, 1988.

In May, 1988, the respondent filed petitions to revoke the commitments, and, without waiting for court action

---

[4] Shortly after Tabitha's birth the respondent moved to Pennsylvania and the DCYS file in Connecticut was closed. Approximately one year later, however, DCYS was contacted by an agency in Pennsylvania and was notified

on these petitions, the maternal aunt returned the children to the care and custody of the respondent. The trial court ordered a psychological evaluation in connection with the respondent's petition. Although the court appointed psychologist, David Mantell, expressed concerns for the children's well-being, the respondent's guardianship of the children was restored in August, 1988, subject to an order of protective supervision by DCYS for one year.

At the time that custody and guardianship were restored, the respondent was living with Tabitha's father, Robert V. He was one of several abusive men with whom the respondent was involved during the time since Tabitha's birth. Two weeks before the expiration of the protective order in July, 1989, the respondent, who was experiencing personal and financial problems, asked the children's maternal aunt to take both children. The maternal aunt was unable to control the children and asked DCYS to place them in foster care. DCYS secured an order of temporary custody and filed new petitions alleging abuse and neglect.

The trial court ordered updates of Mantell's evaluations, which were filed with the court in October, 1989. In conducting these evaluations Mantell met with the children, their foster mothers and the respondent. Mantell recommended that DCYS file petitions to terminate the respondent's parental rights in both children. He concluded that "[t]he consequence of not terminating parental rights will be two psychologically maladjusted and behaviorally disordered children who will be incapable of taking their place in society. If the circumstances surrounding the children are not changed and permanently now, they are likely to be lost forever."

On November 14, 1989, DCYS filed additional petitions seeking the termination of the respondent's paren-

that the respondent had returned to Connecticut, and that there were continuing concerns about her ability to care for her baby.

tal rights as to each child. By agreement of the parties, on July 19, 1990, the trial court, *Axelrod, J.*, adjudicated the children neglected and also found that the grounds alleged for termination of parental rights existed as to each child. The disposition on the termination petitions was continued, however, and an additional psychological evaluation was ordered. The children were committed to DCYS based on the neglect petitions and the respondent entered into a service agreement with DCYS providing for her ongoing contact with both children.

Thereafter, on February 27, 1991, the trial court denied the termination of the respondent's parental rights, but terminated the parental rights of the father of each child. One month later, in March, 1991, Tabitha was returned to the custody of the respondent with the assistance of the intensive family preservation program of DCYS.

In July, 1991, Tabitha's commitment to DCYS was revoked and the respondent's custody and guardianship were restored subject to a six month period of protective supervision. During this six month period, there were numerous reports to DCYS of violent episodes between the respondent and Jeffrey S., her boyfriend at the time. These violent episodes were witnessed by Tabitha. During this period of protective supervision, various support services were discontinued due to the respondent's failure to cooperate.

In December, 1991, the trial court ordered an additional six months of protective supervision, and the respondent signed an agreement that no males would reside in the household without the approval of DCYS. Despite this agreement, Jeffrey S. remained resident in the household until January, 1992.

In January, 1992, DCYS sought a reinstatement of Tabitha's commitment. Following an evidentiary hearing, the trial court ordered Tabitha committed to DCYS

for eighteen months and she was returned to foster care. While in foster care, Tabitha disclosed incidents of maternal maltreatment that had not previously been reported. Tabitha also reported that she did not like living with her mother, and did not make references to missing her mother, wanting to see her mother, or having any emotional attachment to her mother. After Tabitha was returned to foster care, the respondent missed a number of scheduled visits. On one scheduled visit, the respondent told Tabitha that she would kill herself if Tabitha was ever adopted.

During 1992, the respondent did not take advantage of services offered to assist her personal rehabilitation. In the eight months prior to the filing of the petitions to terminate her parental rights, the respondent visited Tabitha only sporadically, failed to attend meetings scheduled with the family service parent education and support group, declined to take advantage of a residential program designed to meet her treatment needs, discontinued an educational and job training program, and missed eleven out of twenty-six scheduled appointments with her child and family agency therapist.[5] DCYS filed the present termination petitions in October, 1992.

The trial court ordered psychological evaluations of the respondent and her children in connection with these petitions. The court appointed psychologist, Robert Meier, found that as of the time of the petitions, most available interventions had been attempted, and that the respondent persisted in blaming others for not doing enough to help her without assuming any responsibility for rehabilitating herself. He concluded: "Given her present personality pattern, her history as indicated by her, the information in the petitions, and the observed focus of attention on her own immediate needs, the prognosis for major change is poor."

---

[5] Damion remained in the same foster placement from 1989 through the time of the termination proceedings.

On the basis of these findings, including the evaluation by Meier, the trial court concluded that DCYS had established by clear and convincing evidence that the respondent had failed to achieve personal rehabilitation as defined by § 17a-112 (b) (2). The trial court further found, on the basis of these facts, additional evidence presented by the state, and consideration of the statutory factors enumerated in § 17a-112 (d), that termination of the respondent's parental rights was in the best interests of both children. This appeal followed.

I

Underlying each of the respondent's claims is the contention that the trial court improperly found that her parental rights should be terminated on the ground that she failed to achieve personal rehabilitation. At the outset, therefore, we address the sufficiency of the evidence to support the trial court's ultimate conclusion that termination of parental rights was appropriate.

The hearing on a petition to terminate parental rights consists of a two phases, adjudication and disposition.[6] See Practice Book § 1042.1 et seq. In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interest of the child.

As relevant to this appeal, the adjudicatory determination to be made by the trial court is whether "the parent of a child who has been found by the superior court to have been neglected and uncared for in a prior

---

[6] Although a hearing on a termination petition consists of two phases, there need not be a bifurcation of the hearing. See *In re Jose C.*, 11 Conn. App. 507, 508, 507 A.2d 1239 (1987); *In re Midgalia M.*, 6 Conn. App. 194, 198–99 n.6, 504 A.2d 532, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986).

proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (b) (2). " 'Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." *In re Migdalia M.*, 6 Conn. App. 194, 203, 504 A.2d 532, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986). In conducting this inquiry, the trial court must "analyze the respondent's rehabilitative status as it relates to the needs of the particular child . . . ." *In re Luis C.*, 210 Conn. 157, 167, 554 A.2d 722 (1989). The trial court must also determine whether the prospects for rehabilitation can be realized "within a reasonable time" given the age and needs of the child. Id. Thus, the trial court's inquiry requires the determination of both the present and past status of the child, and obtaining a historical perspective of the respondent's child caring and parenting abilities. See, e.g., *In re Felicia D.*, 35 Conn. App. 490, 499–501, 646 A.2d 862, cert. denied, 231 Conn. 931, 649 A.2d 253 (1994); *In re Michael M.*, 29 Conn. App. 112, 123–26, 614 A.2d 832 (1992). " 'A determination by the trial court under [§ 17a-112 (b) (2)] that the evidence is clear and convincing that the parent has not rehabilitated herself will be disturbed only if that finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. *Pandolphe's Auto Parts, Inc.* v. *Manchester,* [181 Conn. 217, 221–22, 435 A.2d 24 (1980)].' " *In re Christina V.*, 38 Conn. App. 214, 221, 660 A.2d 863 (1995); see also *In re Megan M.*, 24 Conn. App. 338, 342, 588 A.2d 239 (1991).

In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is

not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in § 17a-112 (d).[7] On appeal, we will disturb the findings of the trial court in both the adjudication and disposition only if they are clearly erroneous. *In re Christina V.,* supra, 38 Conn. App. 221–23.

The trial court, in its written opinion, made detailed findings as to both the adjudication, pursuant to § 17a-112 (b) (2), and the disposition, pursuant to § 17a-112 (d). These findings can be summarized as follows. The services DCYS offered to the respondent and the children over a course of six years, in an attempt to facilitate their reunification, were timely, appropriate and exhaustive. The respondent failed to comply with the expectations and service agreements of DCYS, and was

[7] General Statutes § 17a-112 (d) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the department of children and families has made reasonable efforts to reunite the family pursuant to the federal Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

unable to sustain her involvement in any form of treatment or training. The respondent's inability to sustain involvement in the available programs precluded her from strengthening her parenting skills to effect lasting change. Both of the respondent's children evidence feelings for their mother, but her irregular visitations and lack of understanding of the problems the children were experiencing, required other persons to assume responsibility for providing the necessary stability in the children's lives. Tabitha, age ten, has been placed in foster care three times in less than seven years, and Damion, age eight, has been in foster care for four years. The respondent made some efforts to adjust her circumstances, conduct or conditions to make it in the children's best interest to return to her home, but these efforts have not been consistent and the respondent's capacity for sustained adequate parenting have not significantly improved since the children were first placed in foster care.

Upon reviewing the detailed decision of the trial court and the evidence contained in the whole record, we conclude that the trial court's findings that the respondent has not rehabilitated herself and that termination is in the best interests of both children is not clearly erroneous. Having concluded that this is the case, we now consider each of the respondent's claims of error.

## II

The respondent first claims that the trial court improperly relied on the stale reports and evaluations of Mantell. Mantell had performed three psychological evaluations in 1988 and 1989. Mantell testified at trial in order to provide a backdrop for the current termination petitions, and his three evaluations were admitted into evidence. Mantell acknowledged and there is no dispute that he had no involvement with the respondent and her children between 1989 and the time of the termination

proceedings in 1994. The respondent does not claim that it was improper to allow Mantell to testify or to admit his reports into evidence. She claims, however, that the trial court improperly relied on Mantell's reports as evidence supporting both the adjudicatory and dispositional phases of the termination hearing in 1994. We disagree.

A review of the trial court's memorandum of decision clearly indicates that although the court, in its recitation of the record of prior proceedings, referred to the findings and conclusions of Mantell in his three evaluations, it did not rely on those evaluations in making the adjudicatory finding. In fact, the evidence cited by the trial court to support the adjudication of the grounds for termination was primarily the testimony and reports of Meier, who conducted evaluations of the respondent and her children in 1993.

In the dispositional portion of the court's decision, Mantell's evaluations are mentioned merely as an example of the services provided by DCYS in an attempt to set out a course of action for the respondent to follow to prepare for the children's future. These three evaluations are also mentioned to illustrate the problems the respondent faced in 1988 and 1989 in order to determine if the services provided by DCYS prior to the filing of the present termination petitions were effective. Again, the disposition was based primarily on the evaluations of Meier, especially his diagnosis and prognosis that termination was in the best interests of each of the children.[8] The trial court did not improperly utilize Mantell's evaluations.

---

[8] The respondent also claims that the court improperly based its ultimate conclusions on the testimony of Meier. The respondent cites *State* v. *Smith*, 35 Conn. App. 51, 70, 644 A.2d 923 (1994), to support this claim. *Smith* provides " '[a]n expert witness ordinarily may not express an opinion on the ultimate issue of fact, which must be decided by the trier of fact.' " Id. In *Smith*, however, we held that: "An expert may . . . 'give an opinion on an ultimate issue where the trier, in order to make intelligent findings, needs

## III

The respondent next argues that the trial court improperly failed to credit the testimony of "joint" witnesses who testified on behalf of the respondent or stipulated testimony filed by the respondent. This claim is based on a statement by the trial court that the respondent "did not testify herself nor did she call any witnesses on her behalf, either her therapist, friends, relatives or references of any kind." The respondent points out that several witnesses offered by DCYS were, by agreement, also witnesses of the respondent. In addition, two other witnesses, who were not available for trial, submitted stipulated testimony at the request of the respondent. The respondent claims that the statement of the trial court reflects that any testimony by these witnesses was disregarded, and that this led "to a result that was inconsistent with the evidence and clearly erroneous."

In its thirty page memorandum of decision, the trial court noted each of the witnesses who testified, including those that the respondent identified as "joint" witnesses. Even if the trial court failed to recognize that these witnesses were, in part, testifying for the respondent, this does not change the content of their testimony. As we noted in part I of this opinion, there was sufficient evidence to support the trial court's adjudication and disposition. Accordingly, the trial court's statement does not rise to the level of reversible error.

expert assistance on the precise question on which it must pass . . . .' The trial court's exercise of discretion in admitting expert testimony is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law." Id. Furthermore, "[c]ourts are entitled to give great weight to professionals in parental termination cases." *In re Christina V.*, supra, 38 Conn. App. 221. The record does not suggest that the trial court abused its discretion in admitting Meier's conclusions into evidence or that it failed to consider any other evidence in rendering its ultimate decision. This claim, therefore, is without merit.

IV

The respondent next claims that a statement by the trial court concerning a ground for termination of parental rights that was neither alleged nor argued[9] demonstrates that the trial court was prejudiced, and that this comment, "when considered along with the other issues [raised] on appeal, renders the decision fatally flawed." As previously noted, our review of the record indicates that the findings of the trial court as to both the adjudication and disposition are supported by the evidence. We consider the respondent's claim, therefore, as a contention that the trial court's bias resulted in a denial of due process that should result in a mistrial.

" 'We [do] not ordinarily review on appeal a claim that a trial judge should have disqualified himself or declared a mistrial at a certain stage in the proceedings when no such request was made during a trial.' *Cameron* v. *Cameron*, 187 Conn. 163, 168, 444 A.2d 915 (1982) (citing what is now Practice Book § 4185) . . . ."[10] *Drew* v. *K-Mart Corp.*, 37 Conn. App. 239, 245, 655 A.2d 806 (1995). Because the respondent's argument

[9] The respondent directs us to a statement in the memorandum of decision that provides: "The petitioner has not pleaded the absence of any parent-child relationship under circumstances suggesting that such relationship could not be established or reestablished within a period that would not be detrimental to these children, despite the clear conclusions of Dr. Meier: 'The children do not appear to have positive memories or positive feelings for mother, and Tabitha expresses clearly and openly a preference not to return to mother. Damion demonstrates no more attachment to mother than he does to others he meets or with whom he interacts. Given the amount of time the children have been in placement, the relatively minor role mother has played in their lives, and their dependence on others for their basic needs, it does not appear that there is an on-going parent child relationship. . . .' Had it been pleaded and argued, this court would have been compelled to find that this ground, too, had been made out by clear and convincing proof . . . ."

[10] Practice Book § 4185 provides in part: "The court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may, in the interests of justice notice plain error not brought to the attention of the trial court."

of judicial bias revolves around a single comment, which did not occur until after the close of the evidence, and did not occur in front of a jury, it does not rise to the level requiring appellate scrutiny. Id. The respondent's claim that the trial court's comment requires reversal must fail.

V

The respondent's final claim is that the trial court improperly relied on dispositional material in adjudicating the termination petitions. We disagree.

In the adjudicatory phase of a termination hearing, the trial court determines if one of the statutory grounds for termination of parental rights is proven by clear and convincing evidence. General Statutes § 17a-112 (b). In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment. Practice Book § 1042.1 (4).[11] If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether there is clear and convincing evidence that termination of parental rights is in the best interest of the child. General Statutes § 17a-112 (b). In making this determination, the trial court can consider all events occurring prior to the date of the dispositional hearing, including those occurring after the filing of the termination petition. Practice Book § 1043.1 (1).[12]

[11] Practice Book § 1042.1 (4) provides: "In the adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. In the discretion of the court, evidence on adjudication and disposition may be heard in a nonbifurcated hearing, provided disposition may not be considered until the adjudicatory phase has concluded."

[12] Practice Book § 1043.1 (1) provides: "The court may admit into evidence any testimony relevant and material to the issue of the disposition, including events occurring through the close of the evidentiary hearing, but no disposition may be made by the court until any mandated social study has been submitted to the court."

The trial court's memorandum of decision is divided into parts, one dealing with adjudication and another with disposition. In the adjudicatory part the trial court cited extensively from the reports of Meier, which were prepared after the date the termination petitions were filed. The trial court also cites from social studies prepared by DCYS after the filing of the termination petition for use in the dispositional phase. The respondent contends that reference to these documents indicates that the trial court improperly considered dispositional material during the adjudicatory phase.

Although Practice Book § 1042.1 (4) prohibits the trial court from considering *events* subsequent to the filing of the termination petition during the adjudicatory phase, the court is not prohibited from considering *material* prepared after the filing of the petitions, providing the facts and events discussed in that material predate the filing of the petition. Social studies conducted by DCYS are submitted to be used by the court in the dispositional phase; see Practice Book § 1043.1 (1);[13] but that does not preclude the studies from being filed or considered by the court or used by counsel during the adjudicatory phase of the hearing. In fact, copies of the dispositional reports and any evaluations are made available to counsel for the respondent, and the author of any such report, if available, can be required to testify and be subject to cross-examination as to the reasoning supporting the conclusions contained therein. See Practice Book § 1043.1 (2) and (3).[14] Furthermore, the procedural statutes guiding termina-

---

[13] See footnote 12.

[14] Practice Book § 1043.1 provides in relevant part: "(2) Said study shall be marked as an exhibit subject to the right of any party to require that the author, if available, appear for cross examination.

"(3) The mandated social study or any other written report or evaluation made available to the court shall be made available for inspection to all counsel of record and, in the absence of counsel, to the parties themselves. . . ."

tion hearings explicitly direct the court to order evaluations and to consider the results of the evaluations in ruling on the merits of the petition. See General Statutes § 45a-717 (d).[15]

The materials cited to by the court throughout the adjudicatory portion of its decision contained facts, findings and conclusions based on events prior to the filing of the termination petitions. The events on which the adjudication was premised all occurred prior to the date of the petitions. Thus, the trial court's consideration of the challenged materials did not violate any statute or rule of practice.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[15] The statute governing the procedure of termination petitions and hearings is § 17a-112, which provides in relevant part: "(b) The Superior Court upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant such petition . . . ."

General Statutes § 45a-717 (d) provides: "Upon finding at the hearing or at any time during the pendency of the petition that reasonable cause exists to warrant an examination, the court, on its own motion or on motion by any party, may order the child to be examined at a suitable place by a physician, psychiatrist or licensed clinical psychologist appointed by the court. The court may also order examination of a parent or custodian whose competency or ability to care for a child before the court is at issue. . . . The court may consider the results of the examination in ruling on the merits of the petition."